OFFICE COPY

UNITED STATES DISTRICT COURT    JUDGE LYNCH
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| SALICOR, INC. | **07 CIV 6887** |
| Plaintiff, | CIVIL ACTION NO.: |
| v. | |
| GRETAGMACBETH, LLC., and THOMAS J. VACCHIANO, JR., | |
| Defendants. | |

*[Filed stamp: JUL 31 2007 U.S.D.C. S.D.N.Y. CASHIERS]*

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff, Salicor, Inc., a Pennsylvania corporation, by way of complaint against defendants says as follows:

**Nature of Action**

1.   On or about August 4, 2006, Plaintiff Salicor entered into a Purchase and Sale Agreement with Defendant Gretag ("Purchase and Sale Agreement"), under which Plaintiff Salicor was to purchase from defendant Gretag the premises located at 617 Little Britain Road, New Windsor, New York ("Premises"). This action arises from the wrongful conduct of Defendants with respect to and in connection with the Purchase and Sale Agreement.

**Parties, Jurisdiction and Venue**

2.   Plaintiff Salicor, Inc. ("Plaintiff" or "Salicor"), is a Pennsylvania corporation, with its principal place of business located at 200 Chamounix Road, St. David's, Pennsylvania 19087.

3. Upon information and belief, defendant, GretagMacbeth, LLC ("Defendant Gretag" or collectively with Defendant Vacchiano, "Defendants"), is a Delaware limited liability company, whose principal place of business was the Premises located at 617 Little Britain Road, New Windsor, New York 12553-6148, and whose current address is 3100 44th Street SW, Grandville, Michigan, 49418.

4. Upon information and belief, defendant Thomas J. Vacchiano, Jr., ("Defendant Vacchiano" or collectively with Defendant Gretag, "Defendants"), is or was a resident of the State of Connecticut and is the President and Chief Executive Officer of Defendant Gretag.

5. This Court possesses jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and involves an amount in controversy exceeding $75,000.00, exclusive of interest and costs.

6. This Court possesses jurisdiction over Defendant Gretag inasmuch as Gretag, at all times relevant hereto, was a citizen of the State of New York and conducted business in the State of New York. Defendant Gretag is also the purported owner of the Premises which is located in the State of New York and the subject matter of this lawsuit.

7. The Court possesses jurisdiction over Defendant Vacchiano because, upon information and belief, he is or was a citizen and/or resident of the State of New York and at all times relevant hereto, conducted business in the State of New York and spent substantial time, energy and resources in New York related to the specific transaction at issue herein.

8. Venue in this Court is appropriate pursuant to 42 U.S.C. § 1391(a), because the United States District Court for the Southern District of New York is the judicial district where

the real property at issue (the Premises) is located and where Defendants Gretag and Vacchiano conducted business.

## Facts Common to All Counts

9. Defendant Gretag is the owner of the Premises which consists of approximately twenty-five acres of land and included two structures, one with approximately 85,000 square feet ("Main Building") and the second with approximately 15,000 square feet.

10. Upon information and belief, defendant Gretag is a subsidiary of Amazys Holdings, A.G. ("Amazys"), an international conglomerate that operated Defendant Gretag and its affiliated entities in their business of providing products and services to measure and communicate color for the media, photography, digital imaging, paints, plastics, apparel, textiles, and automotive industries.

11. Upon information and belief, on or about January 31, 2006, Amazys announced that it intended to merge its business with a competitor, X-Rite, Inc. ("X-Rite"), a Michigan Corporation, and the transaction closed on or about July 5, 2006, with X-Rite being the surviving corporation ("X-Rite Merger").

12. Beginning in or about the spring of 2006, Plaintiff Salicor and Defendants Gretag and Vacchiano commenced the negotiations which would lead to the execution of the Purchase and Sale Agreement.

13. Upon information and belief, in addition to owning the Premises, Defendant Gretag occupied and conducted its business from the Premises for many years and continued to do so during the entire negotiation period of the Purchase and Sale Agreement and for several months thereafter.

14. Defendant Gretag by and through its representatives, including Defendant Vacchiano, knew during the entire negotiation period through communications made by the

representatives of Plaintiff Salicor to Defendants Gretag and Vacchiano, that Defendant Gretag's continued occupancy of the portion of the Premises it was then occupying was a material and necessary incentive that induced Plaintiff Salicor to enter into the Purchase and Sale Agreement.

15. Upon information and belief, throughout the negotiation of the Purchase and Sale Agreement, Defendant Vacchiano had direct personal knowledge of all representations and communications by and between Plaintiff Salicor and Defendant Gretag.

16. In order to induce Plaintiff Salicor into entering into the Purchase and Sale Agreement, Defendant Gretag, by and through the negotiations and acts of Defendant Vacchiano, in fact agreed, as part of the Purchase and Sale Agreement, that it would enter into a lease agreement whereby it would continue to occupy space at the Premises.

17. Accordingly, as part of the Purchase and Sale Agreement, Defendant Gretag and Plaintiff Salicor negotiated a lease agreement ("Gretag Lease"), whereby Gretag would continue its business at the Premises. Both Plaintiff Salicor and Defendant Gretag, by and through Defendant Vacchiano, expended substantial time, effort and energy negotiating the terms and conditions of the Gretag Lease.

18. The Gretag Lease was specifically incorporated into the Purchase and Sale Agreement and attached as an exhibit thereto. The Gretag Lease contained numerous provisions that were extensively negotiated all with the express representation by Defendants Gretag and Vacchiano to Plaintiff Salicor that Defendant Gretag would continue to occupy the Premises and be a tenant subsequent to the closing of the Purchase and Sale Agreement.

19. The Gretag Lease specifically provided that Gretag agreed to lease no less than 32,994 square feet ("Gretag Premises"), of the Main Building for a term of 5 years.

20. Defendant Gretag specifically represented that it would continue its business at the Premises through its representations in the Gretag Lease as follows:

**Section 1.03.** The Premises shall be used for the following purposes, but no other purpose (except to the extent provided in section 25.02 hereof), so long as such uses are permitted by applicable laws, namely: the Building may be used for general offices; manufacturing, research and warehouse facilities; the use by Munsell of the activities set forth in Exhibit "D" attached to the Lease; the creation of physical color standards, spraying surfaces with a barium coating, and the assembling of color control systems; laboratories; and related uses.

21. Section 1.04 of the Gretag Lease provided that Gretag was to pay $7.50 per square foot per annum, aggregating $20,621.25 per month for each of the first three lease years of the Gretag Lease, $7.65 for the fourth lease year for an aggregate monthly rental of $21,033.68, and $7.80 for the fifth lease year for a total aggregate monthly rental of $21,446.01.

22. Section 1.04 of the Gretag Lease further provided that Defendant Gretag would pay its proportionate share of the common area maintenance costs and real estate taxes incurred by Plaintiff Salicor for the entire Premises.

23. Pursuant to Section 5.1.9 of the Purchase and Sale Agreement, Defendants Vacchiano and Gretag also represented and warranted that at the time of the closing, Defendant Gretag would execute and enter into the Gretag Lease and, thereby, use and occupy the Premises and pay the rent thereon.

24. Specifically, Section 5.1.9 of the Purchase and Sale Agreement provides as follows:

5.1.9 <u>GretagMacbeth Lease</u>. Attached as Exhibit 5.1.9 is a true, correct and complete copy of that certain Lease, that will be entered into on the Closing Date, immediately following the Closing, between Purchaser, as landlord, with Seller, as tenant ("Tenant"), relating to the Property (the "GretagMacbeth Lease"). The GretagMacbeth Lease will not be modified, amended, or altered from the form attached as Exhibit 5.1.9 hereto, without the consent and agreement of Seller and Purchaser, which shall not be unreasonably withheld provided any such proposed change does not adversely affect any of the financial obligations of the Tenant under the GretagMacbeth Lease or impose additional obligations on the Tenant. There are no brokers' commissions, finders' fees, or other charges payable or to become payable to any third party in

      connection with the transactions contemplated in the GretagMacbeth Lease. Purchaser shall be responsible for creating any demising walls which may be necessary to establish the premises to be leased pursuant to the GretagMacbeth Lease.

25. Based upon the representations made by Defendants Gretag and Vacchiano, Plaintiff Salicor entered into the Purchase and Sale Agreement with Defendant Gretag.

26. The Purchase and Sale Agreement provided that the purchase price for the Premises was $4,850,000.00. Section 2.1 of the Purchase and Sale Agreement required Plaintiff Salicor to make a $50,000.00 deposit at the time it delivered the executed Purchase and Sale Agreement to Defendant Gretag.

27. As required by the Purchase and Sale Agreement, on or before August 7, 2006, Plaintiff Salicor delivered to Defendant Gretag the fully executed Purchase and Sale Agreement along with the $50,000.00 deposit.

28. Defendants Gretag and Vacchiano knew that Plaintiff Salicor had relied upon the express representations contained in the Purchase and Sale Agreement pursuant to which Gretag had agreed to lease the Gretag Premises from Salicor subsequent to the closing transaction as set forth in the Gretag Lease.

29. Based upon the express representations of Defendants Gretag and Vacchiano, Plaintiff Salicor did in fact rely upon Defendants' representations and executed the Purchase and Sale Agreement.

30. Both prior to and subsequent to the execution of the Purchase and Sale Agreement, and based at all relevant times upon the express promises and representations of Defendants Gretag and Vacchiano, Plaintiff Salicor, by and through its representatives, expended substantial time, energy and resources conducting all necessary reviews, examinations and audits necessary to consummate the transaction agreed upon pursuant to the terms and conditions of the Purchase and Sale Agreement.

31.   With the Gretag Lease in place, Salicor was in a position to consummate the transaction on a timely basis and was ready, willing and able to do so at all relevant times.

32.   Article Three of the Purchase and Sale Agreement provided that Plaintiff Salicor had one hundred and thirty five days (135) for inspections and approvals to (the "Due Diligence Period").

33.   Section 3.4 of the Purchase and Sale Agreement provided that Plaintiff Salicor was entitled to terminate the Purchase and Sale Agreement for any reason during the Due Diligence Period.

34.   In or about October 2006, Plaintiff Salicor learned that Gretag had determined that it would close its New Windsor Facility located at the Premises.

35.   The closing of the Gretag Facility necessarily meant that Defendant Gretag would not occupy the Premises as had been promised under the Purchase and Sale Agreement and the Gretag Lease, and had a material detrimental impact on Plaintiff's ability to finance and close the transaction.

36.   Defendant Gretag's impending closing of its facility in fact constituted a breach, or an anticipatory breach, of the Purchase and Sale Agreement.

37.   In an effort to mitigate its damages from said breach, Plaintiff Salicor pursued alternative avenues for consummating the transaction.

38.   On or about December 17, 2006, Plaintiff Salicor and Defendant Gretag executed a First Amendment to the Purchase and Sale Agreement whereby they extended the Due Diligence Period to February 19, 2007, in order to permit Plaintiff to pursue alternative means for consummating the transaction, by finding another substitute tenant or other means of closing.

39.   In or about late January or February 2007, Plaintiff Salicor learned that Defendants Gretag and Vacchiano actually knew before the execution of the Purchase and Sale

Agreement that Defendant Gretag was closing its plant in New Windsor and had no intention of continuing to occupy the Premises or honoring the Gretag Lease at the time it executed the Purchase and Sale Agreement.

40. Indeed, upon information and belief, on or about July 6, 2006, at the time of the consummation of the X-Rite Merger, and a month before the Purchase and Sale Agreement was even executed, Defendant Vacchiano spoke with a local reporter and apparently disclosed that the New Windsor facility was going to be closed and sixty people would be laid off from their jobs.

41. Prior to the execution of the Purchase and Sale Agreement, Defendants never disclosed to Plaintiff Salicor that Gretag was closing its facility. Defendants' express representations that Gretag intended to continue to operate its business in, and to occupy a substantial portion of, the Premises, as expressly provided for under the Gretag Lease, were deliberately false.

42. The false statements and omissions of Defendants Gretag and Vacciano were intended by Defendants to deceive Plaintiff and to induce Plaintiff to enter into the Purchase and Sale Agreement.

43. Plaintiff Salicor relied upon the false statements of Defendants in entering into the Purchase and Sale Agreement.

44. On or about February 12, 2007, Plaintiff Salicor wrote to Defendants Gretag and Vacchiano and advised them that it had recently learned of the Defendants' fraudulent conduct and demanded a reduction in the purchase price to $2,800,000.00.

45. As a result of Plaintiff Salicor's February 12, 2007 letter, on or about February 15, 2007, Plaintiff Salicor and Defendant Gretag agreed to a Second Amendment to the Purchase and Sale Agreement extending the Due Diligence Period from February 19, 2007 until April 9, 2007, and on March 30, 2007, a Third Amendment was executed extending the Due Diligence

Period until May 1, 2007. The extensions of the Due Diligence Period are in pertinent part to allow Plaintiff to pursue further a substitute tenant for the Premises or assignee for the Purchase and Sale Agreement and to allow the parties additional time to modify the terms of the Purchase and Sale Agreement.

46. In recognition of, and as a direct result of, the Defendants' fraudulent conduct, by March 13, 2007, Defendant Gretag in fact agreed to reduce the Purchase Price set forth in the Purchase and Sale Agreement.

47. Thereafter, by the middle of April 2007, Plaintiff Salicor and Defendant Gretag in fact agreed to reduce the purchase price under the Purchase and Sale Agreement to $2,775,000.00.

48. Beginning in or about October 2006, at the time Plaintiff Salicor first learned that defendant Gretag was intending to close its facility, one of the potential solutions for Plaintiff was Quality Carton, Inc. ("Quality Carton"). Plaintiff Salicor in fact entered into negotiations with Quality Carton about a transaction in which, among other things, Quality Carton would become a partner in the acquisition with Plaintiff Salicor.

49. In addition, Plaintiff Salicor had reached out to the brokerage community during this time period to solicit other possible tenants to replace Defendant Gretag.

50. By April 2007, Quality Carton had in fact agreed in principal, however, to enter into a transaction with Plaintiff Salicor, whereby plaintiff Salicor would realize a significant profit, and Plaintiff was ready, willing, and able to enter into this transaction but for Defendants' subsequent wrongful conduct.

51. Defendant Gretag agreed to execute a Fourth Amendment to the Purchase and Sale Agreement whereby the Purchase Price would be reduced to $2,775,000.00 and the Due Diligence Period extended until May 31, 2007, with a closing scheduled on or before June 15, 2007.

52. On Friday April 27, 2007, the terms and conditions of the Fourth Amendment were revised and forwarded by counsel for Defendant Gretag to counsel for Plaintiff Salicor reflecting the agreed Purchase Price and the extension of the Due Diligence Period. Plaintiff was prepared at all times thereafter to execute the Fourth Amendment but for Defendants' wrongful conduct.

53. At all relevant times, Defendants intended for Plaintiff Salicor to rely upon their representation that Gretag would enter into the Fourth Amendment.

54. Plaintiff Salicor also relied upon the Defendants' agreement to enter into the Fourth Amendment.

55. Upon information and belief, unbeknownst to Plaintiff, in or about the early or middle part of April 2007, while Plaintiff Salicor was still the contract purchaser of the Premises pursuant to the Purchase and Sale Agreement, Defendants communicated, or caused persons within their employ to communicate, to the brokerage community that Plaintiff Salicor did not have any rights, contractual or otherwise, to the Premises when in fact such representations were false. Defendants' communications were intended to interfere with Plaintiff's efforts to obtain another substitute tenant for the Premises and, in effect, to compel Plaintiff to withdraw from the transaction.

56. Upon information and belief, Defendants, either directly or through persons employed by them, learned of the terms and conditions of the transaction that plaintiff Salicor had negotiated with Quality Carton prior to May 1, 2007, and wrongfully interfered with those negotiations by, among other things, asserting that Plaintiff Salicor did not have any rights, contractual or otherwise, to the Premises when in fact such representations were false.

57. Upon information and belief, Defendants, either directly or through persons employed by them, communicated specifically with Quality Carton prior to May 1, 2007, that Plaintiff Salicor did not have any rights, contractual or otherwise, to the Premises when in fact

such representations were false. Defendants' false communications were intended to interfere with Plaintiff's impending transaction with Quality Carton, and in effect, to compel Plaintiff to withdraw from the transaction so that Defendant Gretag could enter directly into a transaction with Quality Carton and secure the profit that otherwise would go to Plaintiff.

58. Upon information and belief, Defendants, either directly or through persons employed by them, also agreed to terms and conditions of a transaction with Quality Carton prior to May 1, 2007, with the intent to deprive Plaintiff Salicor of its right to benefit from a transaction with Quality Carton.

59. On Monday April 30, 2007, Defendants refused to honor the agreed upon terms for the Fourth Amendment, refused to recognize the agreed reduction in the Purchase Price, and refused otherwise to honor their commitment to extend the Due Diligence Period.

60. Defendants' refusal to honor their commitment to enter into the Fourth Amendment, and their actions to sabotage the Plaintiff's effort to consummate the deal with Quality Carton or find another suitable tenant through the brokerage community, left Plaintiff with little in the way of alternatives. Plaintiff could allow the May 1, 2007 Due Diligence Period to expire, resulting in its being putatively bound to a contract that it was fraudulently induced to enter at a price that was no longer economically viable, particularly without any committed tenant, and as a consequence any viable financing along the lines contemplated. Alternatively, Plaintiff could terminate the contract.

61. Having no reasonable alternative, on May 1, 2007, Plaintiff Salicor elected to terminate the Purchase and Sale Agreement, while reserving its rights to pursue the relief sought in this action.

62. Thus, as a direct and proximate result of the Defendants' false and wrongful communications both to the brokerage community in general and to Quality Carton, Plaintiff Salicor suffered substantial damages for which it seeks appropriate compensation in this action.

## FIRST CLAIM FOR RELIEF

### (Fraud And Misrepresentation)

63.     Plaintiff Salicor repeats and realleges and expressly incorporates all of the allegations set forth in Paragraphs 1 through 62 of the Complaint as if set forth at length herein.

64.     Defendants fraudulently induced Plaintiff Salicor to enter into the Purchase and Sale Agreement, and then engaged in a continuing fraudulent scheme to deprive Plaintiff of the benefits of the agreements it had negotiated and was poised to achieve.

65.     As a direct and proximate result of the fraud perpetrated by the Defendants, Plaintiff Salicor has suffered substantial damages.

## SECOND CLAIM FOR RELIEF

### (Breach Of Contract)

66.     Plaintiff Salicor repeats and realleges and expressly incorporates all of the allegations set forth in Paragraphs 1 through 65 of the Complaint as if set forth at length herein.

67.     Defendant Gretag repeatedly breached the Purchase and Sale Agreement, as amended, and deliberately sought to deprive Plaintiff of the benefits of the agreement.

68.     As a direct and proximate of the Defendants' breaches, Plaintiff Salicor has suffered substantial damages.

## THIRD CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

69.     Plaintiff Salicor repeats and realleges and expressly incorporates all of the allegations set forth in Paragraphs 1 through 68 of the Complaint as if set forth at length herein.

70. Through its acts and conduct, Defendant Gretag breached the covenant of good faith and fair dealing which Plaintiff Salicor was entitled to rely upon, and in fact did rely upon, with respect to the Purchase and Sale Agreement and the amendments thereto.

71. As a direct and proximate of the Defendants breach of the covenant of good faith and fair dealing, Plaintiff Salicor has suffered substantial damages.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference With Prospective Economic Advantage)

72. Plaintiff Salicor repeats and realleges and expressly incorporates all of the allegations set forth in Paragraphs 1 through 71 of the Complaint as if set forth at length herein.

73. The acts and conduct of Defendants with respect to their wrongful communications to Quality Carton and the brokerage community tortiously interfered with the prospective economic advantage and business relations of Plaintiff Salicor, and from which Plaintiff reasonably and proximately expected to benefit.

74. The wrongful acts of Defendants Gretag and Vacchiano were without justification.

75. As a direct and proximate of the Defendants tortious interference, Plaintiff Salicor has suffered substantial damages.

## FIFTH CLAIM FOR RELIEF

### (Unfair Competition)

76. Plaintiff Salicor repeats and realleges and expressly incorporates all of the allegations set forth in Paragraphs 1 through 75 of the Complaint as if set forth at length herein.

77. Defendants' bad faith business practices directed against Plaintiff were unfair and immoral and constitute unfair competition to the detriment of Plaintiff.

78.    Defendants' unfair competition has directly and proximately resulted in substantial damages to Plaintiff.

WHEREFORE, Plaintiff Salicor demands judgment against Defendants Gretag and Vacchiano as follows for:

A.    Money damages in an amount to be determined at trial on each of the claims set forth above, but believed to be in excess of $150,000 on each claim;

B.    Interest at the rate and in the amount applicable at law as to each of the claims;

C.    Punitive damages in an amount to be determined at trial as to any cause of action for which punitive damages may be available at law;

D.    Costs and Disbursements, including the costs of suit, reasonable attorneys' fees to the extent permitted at law, as to each of the claims set forth above; and

E.    Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Salicor hereby demands jury by trial on all issues so triable.

MORRISON COHEN, LLP

By: _____
         Donald H. Chase (DHC - 6708)
         909 Third Avenue
         New York, New York 10022
         Tel: 212.735.8684
         Fax: 212.735.8600

LASSER HOCHMAN, L.L.C.

By: _____
         John R. Wenzke (JRW-7267)

75 Eisenhower Parkway
Roseland, New Jersey 07068
Tel: 973.226.2700
Fax: 973.226.0844

Counsel for Plaintiff Salicor, Inc.

Dated: July 30, 2007